# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** v. **URIAH WADE HALL** | Case No. 7:17-CR-28 (HL) |

## ORDER

Before the Court is Defendant Uriah Wade Hall's Motion to Suppress Illegally Obtained Evidence. (Doc. 21, 25). Defendant argues that evidence obtained at his residence, n methamphetamine, marijuana, and a firearm, should be suppressed under the "fruit of the poisonous tree doctrine" because (1) the arresting officers illegally detained Defendant without reasonable suspicion or probable cause; (2) law enforcement officers illegally searched Defendant's vehicle; (3) law enforcement officers illegally seized personal property from Defendant's vehicle; and (4) law enforcement officers illegally entered Defendant's residence without a search warrant. After conducting an evidentiary hearing, and after thoroughly reviewing the arguments of Defendant and the Government, the Court finds based on a totality of the circumstances that the law enforcement officers lacked objectively reasonable suspicion to detain Defendant. Accordingly, any evidence of criminal wrongdoing discovered subsequent to the detention is fruit of an unconstitutional intrusion. The Court therefore GRANTS Defendant's motion to suppress.

## I. FACTS

Around 11 o'clock on the morning of March 14, 2017, Lieutenant Rob Picciotti, who is employed with the Special Operations Division of the Lowndes County Sheriff's Department and also a member of the FBI Task Force in Valdosta, Georgia, began his daily patrol in an SUV with Staff Sergeant Tyler Greene, Sergeant Kenny Busby, and Investigator Steve Exum. (Doc. 28, p. 10-11, 41). The officers were not assigned a specific area to patrol. (Id. at p. 12). Rather, they "work[ed] within the county and the outlying areas." (Id.).

Several times throughout the day, the officers patrolled through Webster Street, which "is located on the southern end of the east side of Valdosta." (Id.). According to Lieutenant Picciotti, the area around Webster and Charlton Streets is known to be a "high crime area" predominated by the Gangster Disciple gang and is patrolled several times a day. (Id. at p. 12-13). Of particular interest to Lieutenant Picciotti on the night in question were the adjoining rooming houses located at 402 and 404 Webster Street. (Id. at p. 12). Several months prior, sometime in the fall of 2016, "[t]he area itself had been identified . . . as a location where a number of narcotics deals were occurring in the yards of the two rooming houses either from dealers that were arriving there or persons that were residing at the home." (Id.). Lieutenant Picciotti was involved in serving a search warrant on a Mr. Robert Wimberly, who at that time lived at 404 Webster Street and was suspected of selling methamphetamine. (Id. at p. 13). While awaiting

2

Mr. Wimberly's arrival at the residence to serve the warrant, Lieutenant Picciotti encountered "a couple of gentlemen that were out in front of 402 that were heavy drinkers, older gentlemen that lived there, and we began speaking on and off in times when I would patrol through there and they would identify things to me that were occurring in the area." (Id.).

While Lieutenant Picciotti and the other law enforcement officers passed by the property located at 402 and 404 Webster Street several times on March 14, 2017, they found no cause to stop at the residence. Lieutenant Picciotti remarked that they had observed cars in the driveway, "but I had not seen anybody standing outside that I wanted to speak to. . . . 402 had a lot of guys out front that were drinking that I saw coming and going, but nothing that led to me, hey, you know, who are these people that I want to go up and speak to." (Id. at p. 40). Then, sometime around 9 or 10 o'clock that evening, Lieutenant Picciotti "observed two silhouettes in the driveway." (Id. at p. 14, 40). He did not know who the individuals were, or even whether they were male or female. The two people were standing fifteen to twenty yards from the front side of the residence next to a car with the doors open. (Id.). Lieutenant Picciotti stated, "I wanted to go out and see who the people were that were visiting. I hadn't noticed any activity in the driveway of 404 throughout the day. I wanted to see who that was in the driveway – if they were affiliated with the house." (Id.). The law enforcement officers pulled their SUV into the driveway and parked about a car's length

behind the other cars in the driveway. (Id. at p. 36-37). The officers exited the vehicle en masse, activated their body worn cameras, and approached the two figures. (Id. at p. 14). It was dark, so the officers approached with flashlights. (Id. at p. 43). They each also wore a vest that identified them as law enforcement officers. (Id.).

When the officers first saw the two individuals by the driveway, they were standing on either side of the vehicle. (Id. at p. 14). As the officers approached, the person on the passenger side of the vehicle, who identified himself as Tony Hall, Defendant's father, sat down in the passenger seat. (Id.). Lieutenant Picciotti casually approached Defendant, who appeared to be folding a pair of jeans. (Gov't Ex. 1, Picciotti, 0:08). Picciotti then asked whether the two individuals "stayed" at that address. (Gov't Ex. 1, Picciotti, 0:08-10). Defendant replied in the negative, stating that they live on Magnolia Street. (Gov't Ex. 1, Picciotti, 0:10-15). Picciotti then remarked that law enforcement had received a tip about drug use in the parking lot of a rooming house. (Gov't Ex. 1, Picciotti, 0:10-20).

Lieutenant Picciotti testified that as he was speaking with Defendant, he "pretty quickly smelled an odor of burnt marijuana either coming from the person and/or from the open door of the vehicle." (Doc. 28, p. 16). He also observed that a sandwich bag with the corners removed fell onto the ground as Defendant was folding his jeans. (Id.). Based on his training and experience, clear plastic

4

sandwich bags with the corners removed are a common tool of drug distribution. (Id. at p. 17). Lieutenant Picciotti commented to Defendant on the missing "bag bottoms," which he identified as having fallen out of Defendant's pants and as being observed in the car door. (Gov't Ex. 1, Picciotti, 0:30-42). Defendant responded with the question, "Bag bottoms?" (Gov't Ex. 1, Picciotti, 0:30-32). Lieutenant Picciotti next inquired whether Defendant "used the marijuana," informing Defendant that he smelled "a little bit of burnt marijuana." (Gov't Ex. 1, Picciotti 1:04-06, 1:09-11). Defendant admitted that he does smoke a little bit. (Gov't Ex. 1, Picciotti, 1:08-10). Defendant also admitted that he had smoked marijuana but not at that location as they had just arrived to visit with one of the downstairs residents. (Gov't Ex. 1, Picciotti, 1:10-20). During this exchange, the other officers can be seen looking in and around the car with their flashlights. (Gov't Ex. 1, Busby, 0:01-36; Exum, 0:01-36). One of the officers also runs a check on Defendant's name for any outstanding warrants. (Gov't Ex. 1, Exum, 0:48 -1:04).

It is unclear from the body camera footage which officer requested permission to search Defendant's car, or even if a law enforcement officer affirmatively posed the question. However, Defendant can be heard saying at one point, "You're welcome to do whatever you want to do." (Gov't Ex. 1, Picciotti, 0:42-43). The officers then conducted a physical search of Defendant,

5

his father, and the vehicle. No drugs were found on either individual or in the car. (Doc. 28, p. 45).

The interaction between law enforcement and Defendant did not conclude once the officers completed the search of the car, though. Lieutenant Picciotti continued to detain Defendant so that he could investigate whether Defendant was truthfully reporting that he was visiting another resident. (Doc. 28, p. 19). Apparently, the downstairs resident denied that Defendant was visiting him and instead claimed that Defendant lived in an upstairs apartment. (Id. at p. 19, 21, 47; Gov't Ex. 1, Exum, 3:17-28). Lieutenant Picciotti confirmed through his testimony that during this time, neither Defendant nor his father were free to leave. (Id. at p. 20, 47). Picciotti justified the continued detention based on the presence of alleged drug packaging material, the odor of marijuana, and the inconsistent statements concerning whether Defendant was visiting a resident of the property or whether he resided at the property. (Id.).

Lieutenant Picciotti returned to the car to pursue additional information regarding why Defendant and his father were on the property. He stated that he was "trying to, at this point through my arrest, dispel anything dealing with what I'm dealing with under the violation of Georgia Controlled Substance Act. Where it could be originating from, what areas of the home have you accessed through either consent or illegally? Could a crime have occurred other than a BGCS, say like a burglary." (Id. at p. 23, 48). He wanted to know what other reason the pair

may have "to be there if you haven't visited the person you were telling me you were there to see." (Id. at p. 23).

Lieutenant Picciotti then noticed that Defendant's father was carrying a set of keys on his belt. (Id. at p. 21). He inquired whether any of the keys would fit any of the doors to the residence. (Id. at p. 22). None of Mr. Hall's keys fit any lock. (Id. at p. 49; Gov't Ex. 1, Exum, 7:09-28). Picciotti then returned to the car where he noticed another set of keys on the seat of the car, which Defendant identified as his father's maintenance keys for the building. (Id. at p. 24-25; Gov't Ex. 1, Busby, 9:30-45). Picciotti took the keys from the car, claiming that the keys "were recovered in the car under the consent search of the car." (Id. at p. 25).

Lieutenant Picciotti used the second set of keys to unlock the front door and to enter the building. (Id. at p. 24, 50; Gov't Ex. 1, Busby, 9:58-10:06; Exum, 9:40-10:00). He called "hello" as he started up the stairs from the ground floor to the upstairs apartment. (Id. at p. 25, 50; Gov't Ex. 1, Busby, 10:06-07; Exum, 10:01). Picciotti met another resident of the unit at the top of the stairs, where there was a secondary door. (Id. at p. 25, Gov't Ex. 1, Exum, 10:07-10:29). The man confirmed that he thought Defendant did live in the unit. (Doc. 28, p. 51-52; Gov't Ex. 1, Exum, 10:50-54). He permitted Lieutenant Picciotti to enter the residence so that Picciotti could also speak with another man who lived there and look around the common areas. (Gov't Ex. 1, Exum, 11:30-48). The man, Robert

7

Brown, explained that he, Defendant, and one other person shared the kitchen area but that each had his own locked room. (Gov't Ex. 1, Exum, 11:48-12:07).

Brown pointed out which door belonged to Defendant. (Govt' Ex. 1, Exum, 12:50-13:16). Lieutenant Picciotti testified that he heard a dog in the room identified as Defendant's and that he also could detect the odor of marijuana emanating from the room. (Doc. 28, p. 28). Lieutenant Picciotti then took the keys that had been used to open the front door and successfully tried them in the lock to the room believed to belong to Defendant. (Id. at p. 30; Def. Ex. 10, Greene, 15:37-49).

Sergeant Greene, who had followed Lieutenant Picciotti into the home, returned to the parking lot to confront Defendant with the information gathered inside the residence. (Def. Ex. 10, Greene, 16:54-17:31). Defendant continued to deny that he lived there, saying that he lived with his father on Magnolia Street and explaining that he smoked marijuana at the Magnolia Street address earlier in the day. (Def. Ex. 10, Greene, 16:58-17:16, 17:40-44, 17:47-51, 17:56-58). After a telephone call to the owner of the residence, who again verified that Defendant occupied the room at the top of the stairs to the left, Sergeant Greene placed Defendant in handcuffs but advised him that he was not yet under arrest. (Def. Ex. 10, Greene, 20:46-22:17).

Lieutenant Picciotti asked Defendant whether he wanted to consent to a search of the room or if he wanted the officers to apply for a search warrant.

(Def. Ex. 10, Greene, 22:36-40). Initially, Defendant did not consent, claiming again that he did not live there. (Def. Ex. 10, Greene, 22:42-45). According to Lieutenant Picciotti, soon thereafter Defendant requested to speak with Sergeant Busby "about some things that were in his room, and he knew that he was going to jail." (Doc. 28). Sergeant Busby then Mirandized Defendant, "at which point [Defendant] consented to speak to him without a lawyer present and acknowledged the presence [of] contraband in his room[,] describing the location of it and consenting to a search." (Id.). Defendant consented to a search of the room, where the law enforcement officers recovered marijuana, methamphetamine, drug paraphernalia, digital scales, and a 20-gauge shotgun. (Id. at p. 4, 32).

Defendant was charged with the following: Count One, Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); Count Two, Possessing a Firearm During and in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A); Count Three, Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1); and Count Four, Possession of Marijuana, in violation of 21 U.S.C. § 844(a). (Doc. 1). Defendant has moved to suppress "any and all evidence obtained as a result of his illegal detention, the illegal entry and search of 404 1/2 Webster Street, Valdosta, Georgia, and [his] illegal arrest." (Doc. 21, p. 1).

## II. MOTION TO SUPPRESS STANDARD

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment." United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted).

## III. DISCUSSION

Defendant argues that any and all evidence obtained in this case should be suppressed because law enforcement agents detained him without reasonable suspicion that he had been or was presently engaged in criminal activity.[1] The Government states that the interaction between law enforcement and Defendant began as a consensual encounter. Nevertheless, the Government reasons that the officers possessed reasonable suspicion to approach Defendant at the outset based on the officers' knowledge of the crime rate in the particular neighborhood and Defendant's presence in a dark driveway outside a residential

---

[1] Defendant raised a number of grounds for suppression. However, because the Court finds that the law enforcement agents lacked reasonable suspicion for the initial detention of Defendant, the Court need not reach the merits of Defendant's alternative arguments.

unit where officers received information that alleged drug trafficking activity may be taking place.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…." U.S. Const. amend. IV. Evidence obtained in violation of the Fourth Amendment must be suppressed. United States v. Gilbert, 942 F.2d 1537, 1541 (11th Cir. 1991). However, not all interactions between law enforcement and private citizens implicate the protections of the Fourth Amendment. United States v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Police-citizen encounters are divided into three tiers to analyze possible Fourth Amendment violations: "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006).

A Tier I, or consensual encounter, does not implicate the Fourth Amendment. Id. The law is clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991); see also United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) ("There is nothing in the Constitution which prevents

a policeman from addressing questions to anyone on the streets.") (quotation marks omitted). As the Supreme Court has explained, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." Id. (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)) (quotation marks omitted). "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." Id. (quotation marks and citation omitted). Fourth Amendment scrutiny is not triggered until the encounter loses its consensual nature. Id.

The burden lies with the government to prove "voluntary consent based on a totality of the circumstances." Jordan, 635 F.3d at 1186 (citing United States v. Beckham, 505 F.2d 1316, 1318 (5th Cir. 1975)). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." Perez, 443 F.3d at 777-78 (quotations and emphasis omitted). However, "[i]f the citizen's cooperation is induced by 'coercive means' or if a reasonable person would not 'feel free to terminate the encounter,' . . . then the encounter is no longer consensual, a seizure has occurred, and the citizen's Fourth Amendment

rights are implicated." Jordan, 635 F.3d at 1186 (quoting United States v. Drayton, 536 U.S. 194, 201 (2002)).

The court should consider the following factors when deciding whether a police-citizen encounter was consensual or whether a seizure has occurred:

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

Perez, 443 F.3d at 778 (quotations omitted). These factors should not be applied rigidly; rather, they should be utilized as relevant guidance. Id. "The ultimate inquiry remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority." Jordan, 635 F.3d at 1186 (citing California v. Hodari D., 499 U.S. 621, 626 (1991)).

Here, the Government's blanket statement that the events giving rise to Defendant's ultimate arrest began as a Tier I encounter is not sufficient to meet the burden of demonstrating that the interaction between Defendant and the law enforcement officers was consensual. The totality of the circumstances leads to a very different conclusion. The evidence reveals that the four officers were traveling together in an SUV on the evening in question. (Doc. 28, p. 41). The officers pulled off the main road and drove approximately fifteen to twenty yards down the driveway at 404 Webster Street. (Id. at p. 34). The officers positioned

their vehicle about one car length back from the other vehicles parked at the residence. (Id. at p. 36-37). All four officers then exited the SUV and approached Defendant and his father, who were standing on either side of Defendant's vehicle. The doors to the vehicle were open. (Id. at p. 14). It is plain from the evidence that, despite the congenial interchange between Defendant and the officers, Defendant's freedom of movement was restricted from the outset, both physically and by a show of authority by the four officers surrounding the vehicle, and that a reasonable person in Defendant's position would not have felt free to leave or to otherwise avoid or end the encounter with the law enforcement officers. Nor did the officers ever instruct Defendant that he had the option of entering his vehicle and leaving the premises.

Once a police-citizen interaction elevates to a Tier II encounter, the Fourth Amendment is implicated. The Fourth Amendment does not prevent a police officer "in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even through there is no probable cause to make an arrest." Terry, 392 U.S. at 22. But law enforcement officers may only conduct this type of brief seizure and investigatory stop where "(1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the circumstances which justified the

interference in the first place." Jordan, 635 F.3d at 1186 (citation and internal quotation marks omitted).

"[R]easonable suspicion is a less demanding standard than probable cause," requiring a showing "considerably less than preponderance of the evidence;" but there still must be "at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002). Nevertheless, the officer must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27. When making reasonable suspicion determinations, the reviewing court must look at "the totality of the circumstances" to see whether the detaining officer has a "particularized and objective basis" for suspecting wrongdoing. Arvizu, 534 U.S. at 273 (citation omitted).

Lieutenant Picciotti testified that on March 14, 2017, around 11 o'clock in the morning, he began his daily patrol along with three other law enforcement officers. (Doc. 28, p. 11). The officers were not assigned to a particular patrol area but worked within Lowndes County and the surrounding areas. (Id. at p. 12). According to Lieutenant Picciotti, Webster Street is located in a "high crime area," so law enforcement personnel "patrol[s] through several times a day." (Id.).

During the day on March 14, Lieutenant Picciotti testified that while he had seen cars parked in the driveway at 404 Webster Street, he "had not seen anybody standing outside that [he] wanted to speak to." (Id. at p. 40). "402 had a lot of guys out front that were drinking that I saw coming and going, but nothing that led me, hey, you know, who are these people that I want to go up and speak to." (Id.). Then, around 9 or 10 o'clock that evening, he "observed two silhouettes in the driveway" of 404 Webster Street. (Id. at p. 14, 40). The two individuals were "maybe 15 to 20 yards front the front side of the home next to a car with the doors open on it." Picciotti testified that he "wanted to go out and see who the people were that were visiting. [He] hadn't noticed any activity in the driveway of 404 throughout the day. [He] wanted to see who that was in the driveway – if they were affiliated with the house." (Id.).

Lieutenant Picciotti's interest in this particular address (there is no indication that the officer had any particularized knowledge of Defendant) was piqued several months prior. Sometime in the fall of 2016, the area around 402 and 404 Webster Street "had been identified . . . as a location where a number of narcotics deals were occurring in the yards of the two rooming houses either from dealers that were arriving there or persons that were residing at the time." (Id. at p. 12). Lieutenant Picciotti testified that he was involved in serving a warrant at 404 Webster Street on a prior resident at that address by the name of Robert Wimberly, who was suspected of selling methamphetamine. (Id. at p. 13).

While waiting for Mr. Wimberly to return to the residence in the fall of 2016, Picciotti "identified a couple of gentlemen that were out in front of 402 that were heavy drinkers, older gentlemen that lived there, and we began speaking on and off in times when I would patrol through there and they would identify things to me that were occurring in the area." (Id.).

Even though Lieutenant Picciotti's testimony reveals his prior knowledge of drug-related activity in and around the Webster Street address several months prior to his encounter with Defendant, there is no evidence that Picciotti had any information about present drug activity on the night in question. He and the other officers patrolling the general area had passed by the residence numerous times on March 14, 2017. Despite seeing other cars and individuals coming and going from the property throughout the day, the decision to stop and investigate was not formulated until Lieutenant Picciotti observed the "two silhouettes in the driveway." (Id. at p. 14). Upon approaching the two individuals, Picciotti can be observed in his body cam footage first asking whether Defendant and his father lived at that address and then noting that the officers had received a tip about drug use in the parking lot of a rooming house. (Gov't Ex. 1, Picciottii, 0:08-0:22).

Lieutenant Picciotti's testimony provides no further insight into any alleged tip received by law enforcement concerning drug related activity at this particular residence prior to the detention of Defendant and appears to be nothing more than a pretext for making the stop. The only information Picciotti offered about

any tip relates to casual interactions he had with several local drunks about generalized drug activity in the area. (Doc. 28, p. 13). But a tip from an informant must exhibit "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Alabama v. White, 496 U.S. 325, 327 (1990); see also United States v. Kent, 691 F.2d 1376, 1380 (11th Cir. 1982) ("A known, albeit unproven, informant coupled with subsequent corroboration of the tip's details can justify a reasonable suspicion of criminality."). Lieutenant Picciotti provided no evidence regarding the source of the tip or the specific nature of the tip, nor did he testify about any verification of the tip through independent investigation. Without more, the Court cannot find that any alleged tip provided objectively reasonable suspicion for the initial stop.

In short, it is apparent that when Lieutenant Picciotti made the call to turn into the driveway and to approach the two shadows he observed from the road he was acting on a "hunch" that these individuals may be engaged in drug related activity. Based on a totality of the circumstances, it is clear to the Court that the law enforcement officers were engaged in a generalized investigation and lacked "a particularized and objective basis for suspecting legal wrongdoing" on the part of Defendant. Arvizu, 534 U.S. at 273. Consequently, the later discovery of narcotics and a firearm were fruits of an unconstitutional detention and are subject to suppression. Defendant's motion to suppress is therefore GRANTED.

**SO ORDERED**, this 5th day of February, 2019.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks